**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

ZACHARY RYAN MILLER,         )
          **Plaintiff,**       )
                                )
v.                           )      **CIVIL ACTION NO. 2:14-29568**
                                )
CAROLYN W. COLVIN,           )
**Acting Commissioner of Social Security,**  )
          **Defendant.**      )

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

      This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Orders entered December 12, 2014, and January 5, 2016 (Document No. 4 and 13.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 12.)

      The Plaintiff, Zachary Ryan Miller (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on January 6, 2012 (protective filing date), alleging disability as of June 1, 2009, due to thyroid problems, severe anxiety, panic attacks, nerve problems in head and face causing twitching, depression, and allergies.[1] (Tr. at 12, 175, 178-80, 181-86, 202, 206.) The claims were denied initially and upon reconsideration. (Tr. at 66-75, 76-77, 78-87, 88-97, 98-99,

---

      [1] On his form Disability Report - Appeal, dated April 16, 2012, Claimant asserted that the frequency of his panic attacks had increased and that he experienced increased depression and anxiety. (Tr. at 246.)

102-04, 107-09, 113-15, 117-19, 120-22, 124-26.) On April 13, 2012, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 127-28.) A hearing was held on July 30, 2013, before the Honorable Jason R. Yoder. (Tr. at 28-65.) By decision dated August 16, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12-23.) The ALJ's decision became the final decision of the Commissioner on October 16, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on December 11, 2014, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§

2

404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a <u>prima facie</u> case of disability. <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(C) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

which you are able to function. See 12.00C through 12.00H of the Listing of
Impairments in appendix 1 to this subpart for more information about the factors we
consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the
degree of your functional limitation: Activities of daily living; social functioning;
concentration, persistence, or pace; and episodes of decompensation. See 12.00C of
the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas
(activities of daily living, social functioning; and concentration, persistence, or pace),
we will use the following five-point scale: None, mild, moderate, marked, and extreme.
When we rate the degree of limitation in the fourth functional area (episodes of
decompensation), we will use the following four-point scale: None, one or two, three,
four or more. The last point on each scale represents a degree of limitation that is
incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA

determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of

daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth

(episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless

evidence indicates more than minimal limitation in the claimant's ability to do basic work activities.

20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including
depression, will be deemed severe when (A) there is medically documented continuous or
intermittent persistence of specified symptoms and (B) they result in two of the following: marked
restriction of activities of daily living; marked difficulties in maintaining social functioning;
marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of
decompensation , each of extended duration or (C) there is a medically documented history of a
chronic affective disorder of at least 2 years' duration that has caused more than a minimal
limitation of ability to do basic work activities with symptoms currently attenuated by medication
or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual
disease process resulting in such marginal adjustment that a minimal increase in mental demands
or change in the environment would cause decompensation; or (3) a current history of 1 or more
years' inability to function outside a highly supportive living arrangement, and the indication of a
continued need for such an arrangement.

and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, June 1, 2009. (Tr. at 14, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "panic disorder with agoraphobia, anxiety, social anxiety, social phobia, motor tics indicative of possible Tourette's syndrome, depression, and obsessive compulsive disorder (OCD)," which were severe impairments. (Tr. at 14, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform a full range of work at all exertional levels, as follows:

> [C]laimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to no more than moderate exposure to fumes, dusts, odors, gases, and poor

5

ventilation. He must avoid concentrated exposure to extreme temperature extremes [sic] and humidity. He can understand, remember, and carry out simple, routine tasks that require the use of little independent judgment or decision-making. He can have occasional and superficial interaction with coworkers and supervisors, but no public contact.

(Tr. at 17, Finding No. 5.) At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 21, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a taxi servicer and laborer, at the unskilled, medium level of exertion, and as a housekeeper, at the unskilled, light level of exertion. (Tr. at 21-22, Finding No. 10.) On this basis, benefits were denied. (Tr. at 22, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by

substantial evidence.

Claimant's Background

Claimant was born on July 4, 1983, and was 30 years old at the time of the administrative hearing, July 30, 2013. (Tr. at 21, 34, 178, 181 ) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Tr. at 21, 34, 205, 207.) In the past, he worked as a truck helper and customer service representative. (Tr. at 60-61, 207, 217-22.)

The Medical Record

The Court has considered all evidence of record, including the medical evidence, and discusses it below in relation to Claimant's arguments.

*Evidence Prior to Claimant's Alleged Onset Date, June 1, 2009*:

On August 8, 2008, Dr. M. Barry Louden, M.D., conducted a neurological evaluation of Claimant for his complaints of a two-year history of right facial twitching, eye blinking, and questionable tic syndrome. (Tr. at 415-16.) Claimant also reported compulsive behaviors, such as checking doors and drawers. (Tr. at 415.) Dr. Louden noted that Claimant had a good emotional range and sense of humor. (Tr. at 416.) He noted that Claimant experienced occasional blepharospasm, but Dr. Louden did not observe any other right-sided facial movements. (Id.) Claimant also had occasional right shoulder shrug, but Dr. Louden did not hear him swallow or make other sounds. (Id.) The remainder of Claimant's examination was unremarkable, with normal deep tendon reflexes, gait, and no finger-to-nose ataxia. (Id.) Dr. Louden concluded that Claimant had a disorder on the tic spectrum, but that was not full blown Tourette's syndrome. (Id.) He opined that further treatment was not crucial. (Id.) An electroencephalogram on September 5, 2008, was unremarkable. (Tr. at 284, 417.)

On September 29, 2008, Claimant presented to the emergency department at Camden-

7

Clark Memorial Hospital for acute exacerbation of anxiety symptoms. (Tr. at 285-87.) Claimant reported that he had gone out drinking the night before and experienced difficulty breathing, chest tightness, and anxiety. (Tr. at 285.) At their worst, Claimant's symptoms were described as moderate in nature. (Id.) Dr. Edmond L. Pasternak, D.O., noted that Claimant's exam was unremarkable and administered Albuterol, Atarex, and Phenergan. (Tr. at 286.) Claimant was discharged upon an improved response to medications and with a prescription for Hydroxyzine. (Tr. at 285, 287.)

Claimant returned to the emergency department on September 30, 2008, via ambulance, with complaints of shortness of breath, dry throat, nausea, and vomiting with a two-day history. (Tr. at 291.) He was discharged with diagnoses of nonspecific abdominal pain, gastritis, and viral gastroenteritis. (Tr. at 293.)

Claimant received therapy at the Counseling and Wellness Center from October 13, 2008, through January 23, 2009, for panic disorder and social anxiety. (Tr. at 266-72.) The goals of Claimant's therapy sessions were to decrease the frequency of anxiety and to instill relaxation methods. (Id.) It was noted on January 22, 2009, that Claimant was "doing better" and had tolerated Zoloft well. (Tr. at 266.)

Claimant also treated with Dr. Leah Hopkins, M.D., for management of his chronic medical problems. (Tr. at 314-47, 386-91, 427-32.) On July 17, 2008, Dr. Hopkins noted that Claimant was alert and oriented, had an appropriate affect and demeanor, had intact recent and remote memory, and had fair insight and judgment. (Tr. at 321, 342.) She diagnosed generalized anxiety. (Tr. at 322, 342.) On October 8, 2008, Claimant reported that he had been seen in the emergency room several times since his last visit, and was instructed to double his Klonopin and substitute Ativan for Xanax. (Tr. at 338.) Dr. Hopkins noted that Claimant was doing better with these medication

changes. (Id.) His therapists advised to take 1mg of Klonopin at bedtime. (Id.) Mental status exam and diagnoses remained unchanged. (Tr. at 339.) On January 15, 2009, Dr. Hopkins prescribed Lexapro. (Tr. at 336.) Claimant returned to Dr. Hopkins for a follow-up exam on March 16, 2009, at which time she noted Claimant's reports that his anxiety was "a little better" on Zoloft, and that his family was able to notice a difference. (Tr. at 332.) Claimant reported an ability to go out in public and that he was involved in a serious relationship. (Id.) Mental status exam remained unchanged and Dr. Hopkins increased Claimant's Zoloft. (Tr. at 333.)

On May 18, 2009, Claimant reported that he was "doing about the same," but Dr. Hopkins noted that he "definitely is doing better than before he was on the Zoloft." (Tr. at 329.) Mental status remained unchanged. (Tr. at 330.)

*Evidence After the Alleged Onset Date, June 1, 2009*:

On April 22, 2010, Claimant presented to the emergency department of Camden-Clark Memorial Hospital following a motor vehicle accident. (Tr. at 295-304.)

On May 10, 2010, Claimant told Dr. Hopkins that he was doing well on Zoloft and had gained about twenty pounds. (Tr. at 326.) On mental status exam, Dr. Hopkins noted that Claimant was alert and oriented, had an appropriate affect and demeanor, had intact recent and remote memory, and had fair insight and judgment. (Tr. at 327.) Dr. Hopkins recommend that Claimant continue therapy. (Tr. at 328.)

Claimant treated at Westbrook Health Services from March 31, 2011, through July 2, 2012. (Tr. at 348-85.) On March 31, 2011, Claimant reported that he was doing better, had less anxiety, had a "pretty good" mood, and felt less anxious when he went to public places. (Tr. at 362.) Dr. Kathryn Worthington, M.D., noted that Claimant was alert and oriented, had normal speech, had a pretty good mood and pleasant affect, and did not have any evidence of thought disorders,

9

paranoid ideations, or suicidal or homicidal ideation. (Tr. at 363.) Dr. Worthington continued Claimant's medication regime. (Id.)

On April 27, 2011, Claimant reported that he was about the same, that his medications helped very little, and that he continued to experience anxiety. (Tr. at 365.) With the exception of an edgy mood and a euthymic affect, Claimant's mental status exam remained unchanged. (Tr. at 366.) Dr. Worthington adjusted Claimant's medications. (Id.) On June 7, 2011, Claimant told Dr. Worthington that he was "doing pretty well," that he completely discontinued Klonopin, and that his mood was a little better. (Tr. at 368.) Dr. Worthington noted a pleasant affect and "a little better" mood. (Id.) On June 27, 2011, Claimant reported an increase in anxiety, with three panic attacks per day, while attempting to discontinue Klonopin. (Tr. at 370.) His mood was "bad" and his affect was tense. (Id.) Dr. Worthington continued his medications, but added 1mg of Klonopin at bedtime to alleviate his severe problems. (Id.) Claimant reported on July 18, 2011, that since having restarted the Klonopin, he experienced no panic attacks. (Tr. at 372.) He stated that his mood was pretty good. (Id.) Mental status exam remained unchanged. (Id.) On August 16, 2011, Claimant reported that he did not experience any panic attacks. (Tr. at 374.) However, he reported that overall, he did not feel better or sleep very well. (Id.) Dr. Worthington noted that Claimant's mood was a little better, with a pleasant affect. (Id.)

On September 6, 2011, Claimant stated that he had not "felt this good in a long time" and was quite excited about that. (Tr. at 376.) He reported good sleep and better appetite. (Id.) Dr. Worthington continued his medications. (Tr. at 377.) Claimant continued to report that he was doing well on September 27, 2011, and October 26, 2011. (Tr. at 378, 381.) In October, he stated that he was very pleased with the effects of the Vilbryd and was hopeful that all would continue at the current level. (Tr. at 381.) On November 22, 2011, Claimant expressed concern about possible

Tourettes and stated that he had started working but quit because he was anxious around people. (Tr. at 383.) Dr. Worthington prescribed a trial of Clonidine, which would alleviate somewhat Claimant's symptoms of a tic, if it was Tourettes. (Tr. at 384.) On February 15, 2012, Claimant reported that he was "doing pretty well," but continued to have a little anxiety. (Tr. at 348.) He stated that he was exercising, which made him feel better. (Id.) Dr. Worthington noted a pretty good mood and pleasant affect, regular speech, full orientation, and a denial of thought disorders, suicidal or homicidal ideation, or paranoid ideations. (Tr. at 349.) On March 14, 2012, Claimant reported that he was "not doing to[o] badly." (Tr. at 351.) Mental status remained unchanged. (Tr. at 352.) Claimant's condition remained stable on May 09, 2012. (Tr. at 354-56.)

On June 6, 2012, however, Claimant stated that he was "not doing real well," and had "really bad" anxiety lately. (Tr. at 357.) He stated that his mood was different with increased panic attacks. (Tr. at 358.) He also noted that he had started a job but was unable to stay all day. (Id.) Dr. Worthington noted that Claimant's mental status remained unchanged except for a different mood and euthymic affect. (Id.) She added Wellbutrin. (Id.) Claimant reported improvement with the Wellbutrin on July 2, 2012. (Tr. at 360.) He requested an increase in the Wellbutrin and Dr. Worthington obliged. (Tr. at 360-61.) Claimant noted that his mood was better and that overall, he was "doing adequately" and "reasonably well." (Tr. at 360.)

From August 13, 2012, through December 17, 2012, Claimant continued to report that he was doing "well" or "about the same." (Tr. at 405-14.) Dr. Worthington consistently noted that Claimant's mood was pretty good with a bright affect, and continued her diagnoses of social phobia, panic attacks with agoraphobia, and OCD. (Id.) On February 4, 2013, Claimant stated that he was "doing reasonably well," and did not have any problem with his medication. (Tr. at 403.) On February 27, 2013, Claimant presented on an emergent appointment due to panic attacks and

anxiety. (Tr. at 401.) He reported daily panic attacks that had worsened which resulted in a visit to the emergency department. (Id.) He described his mood as "happy," but indicated that he was unable to handle much of anything, which was very distressing for him. (Id.) Mental status exam revealed a happy mood and tense affect. (Id.) The remainder of the exam was unchanged. (Id.) Dr. Worthington diagnosed anxiety and panic, for which she increased his Ativan. (Tr. at 401-02.) He reported on March 19, 2013, that he had become quite anxious and experienced panic attacks more frequently. (Tr. at 399.) Dr. Worthington noted that Claimant was dating a woman he was quite fond of and thought that was part of the issue. (Id.) She assessed anxiety, panic, and Tourette syndrome. (Id.) She adjusted his medications. (Id.)

On April 24, 2013, Claimant reported that his anxiety was a lot better, and on May 15, 2013, he reported that he was doing well, with less twitching. (Tr. at 394, 396.) He stated that he had not had any panic attacks for some time. (Tr. at 394.)

On July 29, 2013, Dr. Worthington completed a form Mental Assessment of Ability to Do Work-Related Activities, on which she opined that Claimant had marked limitations in his ability to deal with work stresses; moderate limitations in his ability to deal with the public, use judgment, interact with supervisors, relate predictably in social situations, complete a normal work week and work day without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and understand, remember, and carry out complex and non-complex instructions; and slight limitations in his ability to follow work rules, relate to co-workers, function independently, maintain attention and concentration, behave in an emotionally stable manner, and understand, remember, and carry out detailed but not complex instructions. (Tr. at 434-35.) Dr. Worthington explained that Claimant had severe anxiety and social phobia, which would distract him when attempting to learn a job. (Tr. at 434.) She also

opined that Claimant was impeded by his OCD, which caused him "to get stuck at some points of a task." (Id.) She further noted that his anxiety caused him to stay away from others and to cause him to feel uncomfortable. (Tr. at 435.)

On February 27, 2012, Dr. Jeff Boggess, Ph.D., a State agency reviewing medical consultant, opined that Claimant was limited moderately in his ability to interact appropriately with the general public and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 72-73.) He further opined that Claimant retained the ability to perform work-like activity with limited contact with the general public. (Tr. at 73.) On March 21, 2012, Dr. Chester Frethiem, Psy.D., another State agency reviewing medical consultant, opined that Claimant's mental impairments resulted in mild limitations in daily activities, concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and no episodes of decompensation of extended duration. (Tr. at 82-83.) Dr. Frethiem affirmed Dr. Boggess' opinion as written. (Tr. at 83.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in giving little weight to the opinion of his treating psychiatrist, Dr. Worthington. (Document No. 11 at 7-9.) Claimant asserts that the reasons cited by the ALJ in discounting Dr. Worthington's were not "good reasons" as required by the Regulations and Rulings, and confirm his failure to consider all the requisite factors in weighing the medical opinion. (Id. at 8-9.) Claimant asserts that Dr. Worthington's opinion was well-documented and specifically identified the manner in which Claimant's symptoms and behaviors affected his ability to function. (Id. at 9.) He emphasizes that Dr. Worthington's and Westbrook's treatment notes reflected a long pattern of improvement and deterioration in Claimant's conditions, with frequent

medication changes and short-lived positive effects. (Id.) He further takes issue with the ALJ's discarding Dr. Worthington's opinion based on recent treatment notes to the exclusion of two years' worth of treatment records and in light of his date last insured of June 30, 2012. (Id.) Accordingly, Claimant contends that the ALJ failed to comply with the applicable regulations and rulings in giving little weight to Dr. Worthington's opinion.

In response, the Commissioner asserts that substantial evidence supports the weight the ALJ afforded Dr. Worthington's opinion. (Document No. 12 at 8-11.) The Commissioner asserts that the ALJ properly explained that Dr. Worthington's check-mark opinion was inconsistent with her own treatment notes, which reflected "overwhelmingly unremarkable" mental status examinations. (Id. at 10.) She also asserts that the ALJ properly explained that Dr. Worthington's opinion was inconsistent with the other substantial evidence of record, which demonstrated that Claimant's condition improved with routine, conservative treatment. (Id.) Claimant's other treating physicians also noted unremarkable mental status findings. (Id.) The Commissioner further asserts that the ALJ noted that Claimant responded to questions appropriately and without difficulty at the administrative hearing and participated in daily activities without difficulty. (Id. at 11.) The Commissioner contends that the ALJ assessed a restrictive RFC that reflected all of Claimant's credibly supported mental limitations. (Id.)

Analysis.

Claimant alleges that the ALJ erred in giving little weight to Dr. Worthington's opinion. (Document No. 11 at 7-9.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2013). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6)

various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2013). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§

15

404.1527(d)(2), 416.927(d)(2) (2013). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W.D. Va. 1996); <u>see also</u>, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.   20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In the instant matter, the ALJ gave little weight to the findings and opinions of Dr. Worthington because her findings were inconsistent with the most recent treatment records, which demonstrated that Claimant had less twitching and no obsessive compulsive behaviors or panic. (Tr. at 21.) The ALJ noted that the most recent treatment records indicated that Claimant was doing markedly better with his new medication regime and had a good mood, appetite, and sleep. (<u>Id.</u>)

The undersigned finds that the ALJ appropriately summarized the medical evidence of record regarding Claimant's mental impairments and explained his reasons for giving little weight to Dr. Worthington's opinion. As the ALJ found, Dr. Worthington's mental status examinations consistently demonstrated overall improvement in his condition (Tr. at 348, 351, 360, 362, 368,

16

372, 374, 376, 378, 381, 394, 396, 405-14.), despite isolated incidents of setback. (Tr. at 365, 370 357, 399, 401.) When his medications were adjusted, Claimant continued to report that he was doing well. Dr. Worthington's mental status examinations essentially were normal and remained consistent. As the ALJ found, Dr. Worthington's opinion also was inconsistent with the other substantial evidence of record, including Dr. Hopkins' treatment notes, which reflected that Claimant continued to do well on Zoloft. (Tr. at 19-21, 386-91, 427-32.) The record reflected conservative treatment and the absence of recent hospitalizations. (Tr. at 20.) Furthermore, Claimant's social activities improved and he dated a girl. (Id.) Claimant's nervous tic also improved with medication. (Id.) Finally, the ALJ found that Dr. Worthington's opinion was inconsistent with the opinions of the State agency medical consultants. (Tr. at 21.) Accordingly, in view of the foregoing, the undersigned finds that the ALJ's decision to accord little weight to Dr. Worthington's opinion is supported by substantial evidence. Dr. Worthington's opinion was inconsistent with the substantial evidence of record.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 12.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days

(filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 12, 2016.

Omar J. Aboulhosn
United States Magistrate Judge

18